UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE:                                   )<br>                                          )<br> CAMERON D. SMITH and       )<br> MARIANNE O. SMITH,           )<br>                                          )<br>       DEBTORS                   )<br>                                          )<br> EWA ZIELINSKA,                  )<br>                                          )<br>              PLAINTIFF           )<br>                                          )<br> v.                                       )<br>                                          )<br> CAMERON D. SMITH and       )<br> MARIANNE O. SMITH,           )<br>                                          )<br>       DEFENDANTS             ) | CASE NO.  10-22729<br><br>CHAPTER  7<br><br><br>ADV. PRO. NO.  10-2189<br><br>Re:  ECF NO.  1 |

<u>APPEARANCES</u>:

Jonathan M. Shapiro, Esq.                    Counsel for Plaintiff
Shapiro Law Offices LLC
104 Court Street
Middletown, CT 06457

Michael S. Wrona, Esq.                        Counsel for Debtor-Defendants
Halloran & Sage LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103

**MEMORANDUM OF DECISION ON COMPLAINT
TO DETERMINE DISCHARGEABILITY OF DEBT
PURSUANT TO §§ 523(a)(2)(A) AND (4)**

ALBERT S. DABROWSKI, Chief United States Bankruptcy Judge

## I.   INTRODUCTION

In the captioned adversary proceeding, creditor Ewa Zielinska (hereinafter, the "Plaintiff") asks the Court to find her claim against Cameron D. Smith and Marianne O. Smith (hereinafter, together, the "Debtors") excepted from discharge in the Debtors' Chapter 7 bankruptcy case pursuant to §523(a)(2)(A) (false representations or actual fraud) and/or (4) (fraud or defalcation by a fiduciary).

For the reasons set forth hereinafter, the Court finds the debt at issue dischargeable.

## II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant adversary proceeding by virtue of 28 U.S.C. §1334(b); and this Court derives its authority to hear and determine this proceeding on reference from the District Court pursuant to 28 U.S.C. §157(a), (b)(1) and the District Court's General Order of Reference dated September 21, 1984. This is a "core proceeding" pursuant to 28 U.S.C. §157(b)(2)(I).

## III. PROCEDURAL BACKGROUND

The Debtors commenced the captioned bankruptcy case by filing a voluntary petition under Chapter 7 on August 6, 2010 and were granted discharges on November 17, 2010.

The Plaintiff, on October 13, 2010, commenced the captioned adversary proceeding by filing a *pro se* Complaint which the Court thereafter construed as seeking an exception to discharge under both §523(a)(2)(A) and (4). Thereafter, the Debtors filed a *Motion for Summary Judgment* as to the §523(a)(4) claims, which the Court granted, in part: as to the

2

§523(a)(4) claims against Cameron D. Smith (hereinafter, "Mr. Smith"); and, having

determined that there were genuine issues of material fact best resolved at trial, denied,

in part: as to the §523(a)(4) claims against Marianne O. Smith (hereinafter, "Mrs. Smith").[1]

The §523(a)(2)(A) claims as to both Debtors and the §523(a)(4) claim as to Mrs.

Smith came before the Court for trial on December 10 and 12, 2012 (hereinafter, the

"Trial"), at which the Court heard the testimony of each of the parties, admitted numerous

exhibits into evidence, received the arguments of counsel, and then took the matter under

advisement. Having now reviewed the testimonial and documentary evidence received at

the Trial, as well as the entire record of this adversary proceeding and the Debtors'

underlying bankruptcy case, of which the Court takes judicial notice, the Court now issues

this Memorandum of Decision.

## IV.   FACTUAL BACKGROUND

Mrs. Smith met the Plaintiff in 1989 when both lived in Michigan. The Plaintiff began

investing in mutual funds through the bank brokerage firm with which Mrs. Smith was then

employed. Mrs. Smith moved to the East Coast and, in 1999, joined the Investment Firm

of Edward Jones. The Plaintiff moved some of her mutual funds over to Edward Jones in

order to remain a client of Mrs. Smith. Plaintiff, in 2000, lived in Florida for a short time and

thereafter moved to Los Angeles where she continues to reside.

The Plaintiff, around 2004, began asking Mrs. Smith about investing in real estate.

However, Mrs. Smith told the Plaintiff that Edward Jones did not handle real estate

---

[1] *Memorandum of Decision and Order Granting in Part, and Denying in Part, Defendants' Motion for Summary Judgment and Notice of Trial Date* (hereinafter, the "Summary Judgment Ruling"), ECF No. 41, familiarity with which is presumed. Additional detail concerning the procedural background appears in the Summary Judgment Ruling as well as in the Court's *Brief Memorandum and Order Denying Defendants' Motion to Strike Plaintiff's Surreply*, ECF No. 36, familiarity with which is also presumed.

investments and that she was not knowledgeable about real estate.  In 2005, Plaintiff again asked Mrs. Smith about investing in real estate.  Mrs. Smith repeated that neither she nor Edward Jones was involved in real estate.

From these conversations with Mrs. Smith, Plaintiff knew that Mr. Smith was working in the real estate field in Florida and expressed an interest in what he was doing.  Mrs. Smith responded by offering her Mr. Smith's telephone number "if you'd like to talk to [him] sometime."  12/10/2013 Tr. at 12:53:04 p.m.

Mr. Smith was then an owner, jointly with Mrs. Smith who was not involved in the operations of the business, of Fast Title, Inc., a title insurance company in Stuart, Florida. One of Fast Title's biggest customers was Wayne B. Furlong, a Florida real estate agent with Exit Realty and manager of an entity known as Chamaeleon, LLC (hereinafter, "Chamaeleon").  In July, 2005, Chamaeleon contracted to purchase 15 vacant lots in a Florida development known as Rotunda Villas for the sum of $748,500. Def. Exh. 19. Seeking to profit from what was at that time a rising market for Florida real estate, Furlong promptly listed the properties for sale and Fast Title assisted in marketing the properties. Mr. Smith, also optimistic about the prospects for Florida real estate, contracted for Fast Title to purchase five of those lots.

When the Plaintiff contacted Mr. Smith, he explained to her that he was purchasing vacant lots in Rotunda Villas intending to "flip" them, *i.e.*, to resell them at a profit shortly thereafter.  The Plaintiff indicated that she might be interested in such activities.

However, prior to purchasing any lots, the Plaintiff hired a Florida attorney, Michael Maliszewski, to review the sales contracts and consulted, but did not hire, a Florida real estate appraiser.  Mr. Smith testified that the Florida real estate market had been booming

4

and that he fully expected it to continue to do so.  He was purchasing as many lots as he could afford at that time, but had every expectation that he would quickly resell them at a profit and have funds available for additional purchases within six months.  His confidence was such that, when the Plaintiff expressed concern about the risks of real estate investing, he was quite willing to offer her a repurchase agreement (hereinafter, the "Repurchase Agreement") whereby he promised to repurchase lots she purchased in six months if, after listing them with a licensed realtor, she was unable to sell them.

Plaintiff accepted the Repurchase Agreement and contracted to buy the two lots at issue.  At the request of the seller, September 30, 2005 was the closing date set for the sales of fourteen[2] of the fifteen lots Chamaeleon had purchased from Rotunda.

At that time, Mrs. Smith had left Edward Jones and was employed by First Wall Street.  The Plaintiff's account remained with Edward Jones and she was no longer a client of Mrs. Smith.  However, she contacted Mrs. Smith for assistance with the paperwork and procedures involved in arranging for the proceeds of her mutual fund to be deposited to her Edward Jones account and then wired to Fast Title in time for the closing.  Mrs. Smith helped the Plaintiff with the forms and procedures and contacted a former co-worker at Edward Jones to assist the Plaintiff in effectuating the transfer.  Mrs. Smith testified that, although she knew that the Plaintiff had contacted Mr. Smith, she was not aware that the Plaintiff had decided to purchase real estate until she sought to transfer the funds.

The closings took place as scheduled on September 30, 2005.  Through the various escrow ledger cards and deeds of title introduced into evidence by both the Plaintiff and

---

[2]  Neither party provided any evidence from which the Court could ascertain whether or to whom the fifteenth lot was sold. Since its disposition had no effect on the Debtors or the Plaintiff, it is not material to the present proceedings.

the Debtors, the Court was able to "follow the money" involved in the transactions that occurred.  The transactions are summarized as follows:

-    Fast Title purchased 5 lots for $220,000.  It appears that Fast Title may have then sold two of these lots to Mr. Smith's sister for $100,000 and kept the remaining three lots.  The documentary evidence also supports the Debtors' testimony as to the sources of the $220,000: $70,000 wire transfer from Mrs. Smith's account at Edward Jones; and $150,000 proceeds from the sale, on August 29, 2005, of an unrelated property.

-    Plaintiff purchased 2 lots for $102,448.

-    Four other parties (with no known connection to either the Plaintiff or the Debtors) purchased a total of 7 lots for an aggregate amount of $351,300.

The Plaintiff waited three months before listing her lots for sale with a realtor. In early 2006, she listed the lots with Wayne Furlong.  Unfortunately for all involved, it was around this time that the Florida real estate market began its precipitous decline.  The Plaintiff was unable to sell her lots and sought to enforce the Repurchase Agreement. The Plaintiff engaged attorney Jeffrey Coleman, who sent a letter, dated September 7, 2006, to the Debtors demanding that they repurchase the Plaintiff's two lots pursuant to the Repurchase Agreement.  Mr. Smith testified that he did not repurchase the lots as he had intended because he was no longer financially able to do so; that the unexpected and precipitous drop in real estate values was not only eroding the value of his investment properties, but was destroying the title insurance business that had provided his livelihood.

In August 2007, the Plaintiff filed a complaint against Mrs. Smith and her former employer Edward Jones with the Financial Industry Regulation Authority (hereinafter,

6

"FINRA"), on grounds of "Unsuitable Recommendations" and "Sale of Unregistered Securities."  The allegations of the FINRA complaint, which was written by the Plaintiff and filed over the internet, do little to bolster her credibility.  The FINRA complaint alleges that, while she was employed at Edward Jones, Mrs. Smith had solicited the Plaintiff to invest $102,448.10 in a "Florida Investment Property fund" and that "I was promised that the funds would be returned to me in a 6 month timeframe [sic] with interest."  Such statements are clearly contrary to the undisputed facts: (1) Plaintiff purchased two vacant lots of real property (FINRA deals only with securities, not real property sales); she did not invest in a "Florida investment Property *fund;*" and (2) the Plaintiff, who had previously consulted with counsel and sought to enforce the terms of the Repurchase Agreement knew it was not a promise to return her funds with interest in 6 months, but a promise to repurchase two lots.

Mrs. Smith testified that being the subject of an ongoing FINRA investigation threatened her employment situation and that she suffered a loss of earnings.  To dispense with the FINRA action, the Debtors, on October 4, 2007, signed a Settlement Agreement drawn up by the Plaintiff's attorney, Jeffrey Coleman, whereby the Debtors would pay $105,448, with interest at 7% per annum, to be amortized over five years as follows: an initial lump sum payment of $20,000; monthly payments of $1,691.97 for 13 months; a lump sum payment of $10,000 on December 1, 2008; and monthly payments of $1,420.90 thereafter through November, 2012.  The Plaintiff would withdraw her FINRA complaint; and, upon completion of all payments, the Plaintiff would transfer title to her two lots to the Debtors. If the lots were sold prior thereto, net proceeds would be applied to reduce the amount of the remaining monthly payments under the Settlement Agreement.

7

Notwithstanding the terms of the Settlement Agreement, the FINRA investigation remained ongoing until May 7, 2008, at which time, FINRA sent a letter to the Plaintiff, with a copy to Mrs. Smith, stating, in relevant part:

> This is to advise you that FINRA has completed its review of the matter that you brought to our attention in your initial correspondence of August 2007 regarding Edward Jones and Marianne Oshee Smith.
>
> Our investigation included an analysis of the information you provided and additional details we collected during the examination process. Based on our assessment of the information, FINRA has closed its investigation of this matter.

Plaintiff's Exh. GGG at 9. The letter makes no reference to a "withdrawal" of the complaint by the Plaintiff.

When she became the subject of a FINRA investigation, Mrs. Smith was forced to resign from her position at First Wall Street Corp. and was unemployed for almost six months before being hired by another brokerage firm.

The Debtors attested to their intent, at the time they entered into the Settlement Agreement, to comply with its terms. Such intent is supported by their payment of the initial $20,000 lump sum and several additional installments pursuant to the Settlement Agreement for a total of $25,571.91 before the financial strain of Mrs. Smith's job loss, together with that of Mr. Smith's failing real estate title business made it impossible for them to continue. Following their default on the Settlement Agreement, the Debtors offered to transfer their three lots to the Plaintiff in satisfaction of the debt. The Plaintiff refused because the value of the lots was so low and they were encumbered by liens for unpaid property taxes. Thereafter, in an email sent to the Plaintiff on July 24, 2008, Mr. Smith requested a modification of the Settlement Agreement:

> Ewa,

I have left the title company in Florida because I wasn't able to make any money.  I have taken a temporary job in Portland, Oregon working as a computer programmer.  Since I have accumulated so many debts, I have had to turn over control of my finances to a third party appointed by an attorney in lieu of bankruptcy. I have explained the situation to them and they have agreed to allocate $500 per month toward the repayment of the lots to you.

This is all I can afford right now and if I am able to eliminate other debts, that amount will increase as long as I am still employed.  They don't feel that it is a good idea to deed the lots to you because there are taxes owed on them which I can't afford to pay right now.

Please let me know if this is acceptable and I will send you an agreement.

Thank you,
Cameron

Debtors' Exh. 45.

The Plaintiff then filed a civil action in Florida state court which, on March 8, 2010, granted summary judgment in favor of the Plaintiff and awarded damages in the amount of the unpaid balance under the Settlement Agreement.

## V.    DISCUSSION

### A.    *Burden and Standard of Proof*

The burden of proof in a nondischargeability proceeding is on the creditor seeking an exception to discharge to prove, by a preponderance of the evidence, that its claim satisfies the requirements of one of the discharge exceptions enumerated in Bankruptcy Code §523(a).  *Grogan  v. Garner* , 498 U.S. 279, 286, 111 S. Ct. 654 (1991).  Further, "exceptions to dischargeability are narrowly construed, an approach that implements the fresh start policy of the Bankruptcy Code."  *National Union Fire Insurance Co. of Pittsburgh, Pa. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 300 (2d Cir.1996) (citations and quotation marks omitted).

**B.      Section 523(a)(4) - Fiduciary Defalcation**

Bankruptcy Code §523(a)(4) excepts from discharge "any debt . . . for fraud or

defalcation while acting in a fiduciary capacity."  The Court assumes familiarity with its

articulation, in its Summary Judgment Ruling, of the general principles concerning whether

a debtor is acting in a fiduciary capacity in the context of §523(a)(4).  Accordingly, the

discussion herein is limited to matters that touch upon the particulars of the relationship

between Mrs. Smith and the Plaintiff.

In the present proceeding, as to the Plaintiff's claim under §523(a)(4), the Court

must determine (i) whether there was a fiduciary relationship between Mrs. Smith and the

Plaintiff; (ii) if so, what was the scope of such fiduciary obligations; (iii) whether the conduct

complained of was within the scope of such fiduciary duties; and (iv) whether the conduct

complained of rose to the level of fraud or defalcation while acting in a fiduciary capacity.

The basis for the Plaintiff's claim that Mrs. Smith was a fiduciary arises from their

broker-client relationship.

> [However,] there is no general fiduciary duty inherent in an ordinary
> broker/customer relationship.  Such a duty can arise only where the
> customer has delegated discretionary trading authority to the broker. [The
> plaintiff's]  accounts with [the defendant] were not, however, discretionary
> and where the customer maintains a nondiscretionary account, the broker's
> duties are quite limited.  For example, where the terms of a nondiscretionary
> account require the customer's authorization on all transactions, a broker has
> a fiduciary duty to notify the customer before making sales.  And, a broker
> on a nondiscretionary account has the duty to execute requested trades.

*Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 -941

(2d Cir. 1998) (citations omitted).  It is undisputed that all of the accounts that Mrs. Smith

serviced for Plaintiff at Edward Jones and elsewhere were nondiscretionary accounts and

that the Plaintiff was the ultimate decision maker as to the purchase or sale of any

10

securities.

> It is uncontested that a broker ordinarily has no duty to monitor a nondiscretionary account, or to give advice to such a customer on an ongoing basis. The broker's duties ordinarily end after each transaction is done, and thus do not include a duty to offer unsolicited information, advice, or warnings concerning the customer's investments. A nondiscretionary customer by definition keeps control over the account and has full responsibility for trading decisions. On a transaction -by - transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders, and is obliged to give honest and complete information when recommending a purchase or sale. The client may enjoy the broker's advice and recommendations with respect to a given trade, but has no legal claim on the broker's ongoing attention. *See, e.g., Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir.1999) (broker's fiduciary duty is limited to the "narrow task of consummating the transaction requested"); *Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940-41 (2d Cir.1998) (in a nondiscretionary account, "the broker's duties are quite limited," including the duty to obtain client's authorization before making trades and to execute requested trades); *Schenck v. Bear, Stearns & Co.*, 484 F.Supp. 937, 947 (S.D.N.Y.1979) (noting that the "scope of affairs entrusted to a broker is generally limited to the completion of a transaction"); *Robinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 337 F.Supp. 107, 111 (N.D.Ala.1971) ("The relationship of agent and principal only existed between [broker and nondiscretionary customer] when an order to buy or sell was placed, and terminated when the transaction was complete."); *Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F.Supp. 951, 952-54 (E.D.Mich.1978) (same; drawing distinction between discretionary and nondiscretionary accounts); *accord Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508, 516-17 (Colo.1986) (observing same distinction, and holding that existence of broad fiduciary duty depends on whether broker has "practical control" of customer's account).

*de Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1302 (2d Cir. 2002).  Any

fiduciary relationship arising out of a nondiscretionary broker-client relationship exists in

the context of a particular transaction.  When the Plaintiff asked for advice about investing

in real estate, Mrs. Smith made it clear that Edward Jones was not involved in real estate

and that she herself was not knowledgeable about real  estate investments.  Thus, even

if Mrs. Smith and the Plaintiff had discussed real estate, any such conversation could not

11

have related to a transaction within the scope of their broker-client relationship and therefore did not occur while Mrs. Smith was acting in a fiduciary capacity. As to Mrs. Smith assisting the Plaintiff with the procedures for the wire transfer, (i) such assistance was ministerial in nature; (ii) it was provided voluntarily at a time when there was no broker-client relationship between them; (iii) Mrs. Smith merely advised and assisted, while the transaction itself was effectuated by others. Moreover, the transfer took place at the request of the Plaintiff and the process and outcome were in accordance with her directives.

Although the Summary Judgment Ruling refers to a "special circumstances" exception to the narrow confines of the fiduciary obligations in a nondiscretionary broker-client relationship, the Court finds the Plaintiff is not a "naive and vulnerable client who is protected by 'special circumstances.'" *Id.* at 1309. Plaintiff's counsel argues that the scope of Mrs. Smith's fiduciary obligations to the Plaintiff should be broadened under the "special circumstances" exception because she was raised in Poland unfamiliar with the concept of investments; that English is not her first language; and that she "trusted" Mrs. Smith. The Court finds such arguments unavailing. The Plaintiff has lived in the United States for over 34 years; is well-educated, holding a Master's degree in microbiology and working as a research biologist at two hospitals for at combined 27 years; she has been investing her own funds and those of her mother for more than 20 years; and has been savvy in seeking the advice of counsel when appropriate. She presented no evidence of any physical or mental impairment that might justify imposing additional obligations on a nondiscretionary broker.

## C.    Section 523(a)(2)(A) - Fraud

In her second claim for relief, the Plaintiff asks the Court to find her claim against the Debtors nondischargeable under §523(a)(2)(A), which excepts from discharge "any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. §523(a)(2)(A).

> Under well-established § 523(a)(2)(A) principles, the plaintiff bears the burden of proof on each of the following five elements:
>
> (1) the debtor made the representations; (2) at the time he knew they were false; (3) he made them with the intention and purpose of deceiving the creditor; (4) the creditor relied on such representations; (5) the creditor sustained the alleged loss and damage as the proximate result of the representation having been made.... To be actionable, the debtor's conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law (which may exist without imputation of bad faith or immorality) is insufficient.

*Universal Bank, N.A. v. Owen (In re Owen)*, 234 B.R. 857, 860 (Bankr. D.Conn.1999) (quoting *AT&T Universal Card Services Corp. v. Williams ( In re Williams)*, 214 B.R. 433, 435 (Bankr. D.Conn.1997)).

The Plaintiff alleges that Mr. Smith, in signing the Repurchase Agreement, and both Debtors, in signing the Settlement Agreement, falsely represented their intent to abide by the terms thereof. The Court finds such allegations lack any credible evidentiary support and that the Plaintiff has utterly failed to satisfy her burden of proving them by a preponderance of the evidence.

### 1. *Repurchase Agreement*

The Court credits Mr. Smith's testimony that, at the time he entered into the Repurchase Agreement, he had every intention of complying. His experience working in

13

the Florida real estate business at Fast Title had convinced him that the phenomenal
increases in the Florida real estate market were likely to continue for the foreseeable
future.   Mr. Smith expected that neither he nor the Plaintiff would have any problem quickly
reselling their lots at a profit.   From his perspective, if the Plaintiff failed to do so, he would
be happy to purchase her lots and "flip" them himself.   He anticipated that, within six
months, he would have sold his own lots and have the proceeds available to purchase the
Plaintiff's lots.   The Plaintiff produced no evidence that Mr. Smith, at the time of the
agreement, intended to breach it.   She states that she relied on the promise to repurchase
in deciding to buy her lots, but Plaintiff's reliance, without evidence that the Debtor, at the
time of the agreement, made a knowing and false representation, will not support a finding
of nondischargeability under §523(a)(2)(A).

### 2.    *Settlement Agreement*

By the time the Debtors signed the Settlement Agreement in October, 2007,
circumstances were markedly different from those in 2005.   The Florida real estate market
had plummeted, the Debtors' title insurance business was struggling, neither the Debtors
nor the Plaintiff had been able to sell their lots which by then were valued at only a fraction
of their purchase prices, and Mr. Smith had been financially unable to purchase the
Plaintiff's lots in accordance with the Repurchase Agreement.   Mrs. Smith continued to be
employed by First Wall Street until the Plaintiff filed her FINRA complaint in August, 2007,
costing Mrs. Smith her job.

The Plaintiff agreed to withdraw her FINRA complaint if the Debtors would agree to
the terms of the Settlement Agreement drafted by her attorney.   The Debtors, under the
impression that Plaintiff's withdrawal of her FINRA complaint would end the FINRA

14

investigation that prevented Mrs. Smith from earning a living, agreed.  The Plaintiff faxed the Debtors a copy of her "withdrawal" of the FINRA complaint (hereinafter, the "Withdrawal Notice").  Plaintiff's Exh. GGG at 7.  Although the Settlement Agreement states that "the [Plaintiff] will withdraw her complaint with FINRA using the form attached hereto as Exhibit C," the copy of the Settlement Agreement entered into evidence, Plaintiff's Exh. UU, includes no "Exhibit C."

The Withdrawal Notice was directed only to "To whom it may concern" and was addressed only to FINRA's investor complaints web site.  It makes no reference to the identifying number assigned by FINRA to the complaint, 2007 010 0973, nor does it even include the typed or printed name of the sender - just her handwritten signature (the record does not explain how she sent the document with her handwritten signature as an email).  Nor is there any evidence in the record to indicate that FINRA ever received this Withdrawal Notice.  In any event, the Plaintiff's purported withdrawal had no effect on the FINRA investigation which was not closed until May, 2007 at which time FINRA closed it "based upon our assessment of the information," with no mention of any withdrawal of the complaint.  Plaintiff's Exh. GGG at 9.

The ongoing FINRA investigation made it difficult for Mrs. Smith to find employment, exacerbating the Debtors' already difficult financial situation and eliminating the income they had intended to apply to the payments due under the Settlement Agreement.  The Court finds the Debtors' explanation of the events amply supported by the evidence, including the Debtors' payment to the Plaintiff of $25,571.91 prior to default and their attempts to renegotiate the terms by either transferring real estate or modifying the amortization.

15

### 3. *"Actual Fraud"*

The Plaintiff also argues that her claim be held nondischargeable under §523(a)(2)(A) as "actual fraud." She contends that Mr. Smith was actively assisting Wayne Furlong in a scheme to defraud her; that Mr. Smith failed to disclose to her that "they" had purchased properties intending to "flip" them at a profit; and that Mr. Smith failed to inform her that he would receive his five lots at little or no cost in return for helping Wayne Furlong to sell them. This argument is completely unsupported by the evidence presented at the Trial. Contrary to Plaintiff's allegations, the evidence, including Plaintiff's own Exhibit JJ (escrow account ledger card), support the Debtor's testimony that they paid $220,000 for the purchase of their five lots and indicated the sources of such funds. The only remuneration the Debtors received in connection with the Plaintiff's purchase of the two lots was a payment to Fast Title of its $340.00 fee for handling the closing. Mr. Smith made no secret of his intent to purchase lots and "flip" them at a profit; urged the Plaintiff to do likewise. The Court finds that Plaintiff has not met her burden of proof as to "actual fraud."

## V.    CONCLUSION

The Plaintiff has failed to establish §523(a)(4)'s requisite "fiduciary" relationship between her and Mrs. Smith. In addition, the critical and requisite fraudulent intent and false statements of §523(a)(2)(A) simply cannot be derived or implied from the evidence presented in this proceeding, and are contrary to the credible testimony of the Debtors. Accordingly, the Court determines the subject debt as alleged in the Complaint to be dischargeable.

This Memorandum of Decision shall constitute this Court's Findings of Fact and Conclusions of Law pursuant to Fed. R. Bankr. P. 7052.  A separate judgment shall enter simultaneously herewith.

Dated: September 30, 2013                                    BY THE COURT

Albert S. Dabrowski
Chief United States Bankruptcy Judge